UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X

UNITED STATES OF AMERICA,                             Docket No.

— against —                                            25 Cr. 116 (ER)

RAUL AYALA,

            Defendant.

------------------------------------------------------X

**SENTENCING MEMORANDUM FOR RAUL AYALA**

 

Kenneth J. Montgomery, Esq.
Attorney For Raul Ayala
396 Waverly Avenue
Brooklyn, New York 11238

(718) 403-9261

# LAW OFFICE OF KENNETH J. MONTGOMERY P.L.L.C.
## 396 WAVERLY AVENUE
## BROOKLYN, NEW YORK 11238
## PH (718) 403-9261 FAX (347) 402-7103
### ken@kjmontgomerylaw.com

December 1, 2025

**Via ECF**

The Honorable Edgardo Ramos
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

                        **RE: United States v. Raul Ayala**
                          **Criminal Docket 25 CR 116 (ER)**

Dear Judge Ramos:

      This sentencing memorandum is written in advance of sentencing for Raul Ayala regarding his plea of guilty to Count 2 of the indictment in violation of the following:

(1) Firearm possession 18 U.S.C. ξ 924 (c)(1)(A)(i).

      Raul Ayala is a 21-year-old young man born and raised under some uncontrollable risk factors present in his home and the Harlem and South Bronx neighborhoods in which he was raised by his mother. Even before birth, the circumstances of Raul's life were marked by generational trauma on both his mother's and father's sides of the family. Both of his parents had migrated to America looking for opportunity. Raul's mother migrated from Cuba, and his father migrated from Honduras. Raul's parents were never married, and although they parted ways soon after his birth, his father remained in his life up until his deportation from America. At a very young age, Raul had some truancy issues with school. His mother was a single mother who worked several jobs to provide for Raul and his siblings. Because of her work hours, Raul and

his siblings were often home alone without any parental supervision. Raul, without his father being a constant presence in the home, and while his mother was working, Raul stopped going to school and dropped out of high school altogether in ninth grade. Raul would soon be incarcerated at Crossroads juvenile jail after being prosecuted for a designated felony in Family Court. Raul would spend 18 months in juvenile custody as a young teenager.

After dropping out of school, Raul chose a familiar and typical route that many young men who are without protective factors and a formidable community choose. Raul chose street life as a child. His journey into street life has naturally come with arrests and misdirection. Raul is now a young father as he is the father of a 1-year-old daughter. Raul's daughter was born while he was incarcerated. Raul is well aware of the cycle that he is in. His father was incarcerated at some point in his young life, and now he is incarcerated while his daughter is very young.

The late, brilliant, and well-respected Federal District Court Judge Jack Weinstein provided context to the choices that young men like Raul make. Raul's early criminal contact at such a young age is not surprising, considering his family dynamics at home. Raul lacked stability and resources. He would often shuffle back and forth between his mother's crowded apartment in Harlem to the more spacious home in Long Island where his paternal grandmother lived. The shuffling was not enough to point Raul in the right direction. See, United States v. Bannister, 786 F. Supp.2d 617, 653 (E.D.N.Y. 2011) (Weinstein, J.) ("With the father absent and the mother working, many ghetto children spend the bulk of their time on the streets . . . of a crime-ridden, violence-prone and poverty-stricken world. The image of success in this world is not that of the 'solid citizen,' the responsible husband and father, but rather that of the 'hustler' who promotes his own interests by exploiting others. The dope sellers . . . are the 'successful' men because their earnings far outstrip those [of] men who try to climb the economic ladder in honest ways.") (quoting The Kerner Report: The 1968 Report of the National Advisory Commission on Civil Disorders 267, 262 (Pantheon 1988)). The context of this phenomenon is that this behavior doesn't simply happen in a vacuum; it is associated with social, political, and economic alienation that is often cyclical from one generation to the next. This is clear from a quick look into Raul's family background and history. See United States v. Bannister, 786 F. Supp.2d at 653 ("In place of steady jobs and the values and satisfactions that

those jobs inculcate, low-income African Americans in urban neighborhoods are left with an economic desperation that can lead to antisocial behavior. . . . '[W]hen jobs disappear, and people are left poor, highly concentrated, and hopeless, the way is paved for the underground economy to become . . . an unforgiving way of life organized around a code of violence and predatory activity.'") (citation omitted). These issues are more pronounced, whereas in Raul's case, he doesn't have a strong educational background.

Raul is now beginning to appreciate his life with the recent birth of his daughter. Raul is, for the first time in his life, very interested in seeking therapy to help him abstain from drug use and control his anger, and also obtaining his GED, and developing a skill set to seek gainful employment to help provide for his daughter once he is released from federal prison. He is very regretful of his criminal conduct and has accepted responsibility for his actions. He understands that he will be sentenced by the court, and that sentencing is a result of his own actions; he simply wants to become a better person for himself and his daughter. He hopes to become a productive member of society and change the narrative of his life and the life of his daughter once he is released from prison.

Studies show that the most affected by prison sentences are the young children of the incarcerated. In many ways, Raul's young life is a roadmap for how young men become normalized to deprivation and bad decisions at a very early age. His resorting to crime is a familiar path. A path that is even more enticing to a certain population of young people in this digital and social media-driven age, where young people are consumed with gang and street life imagery through the filter of entertainment. Young men like Raul and his co-defendant find themselves in an anti-social cycle where they believe criminality is the only way to escape their environment.

## **YOUTH CRIMINAL ACTIVITY**

Raul will be 21 years old at the time of his sentencing hearing; however, he was even younger during his participation in the charged federal crime. The stipulated and agreed-upon guideline range is 84 months.

I have spent a considerable amount of time with Raul in my representation of him. I often think about what his life would be like if he had a halfway stable environment with healthy parental guidance and opportunity.

The Supreme Court and the scientific community have opined that the brains of young men do not fully develop until they are 25 years old. Young people are less able to evaluate the consequences of their conduct. Still, that process is even more complicated when that teenager suffers from poverty, generational trauma, and abandonment.

In <u>Miller v. Alabama,</u> 567 U.S. 460 (2012), the Court discussed the mitigating factors in youth crime. The Supreme Court relied on factors distinguishing adults from adolescents. Those factors can be grouped into four traits: youthful offenders' immaturity, susceptibility, salvageability, and dependence. Offenses by the young also represent a failure of family, school, and the social system, which share responsibility for the development of American youth. 487 U.S. at 834. In Defendant's case, the social system and the circumstances of his childhood failed him miserably. In his youth, the defendant was greatly impacted by his neighborhood and the splitting of his parents. Although cognitive neuroscience is still in its infancy, and much of what has so far emerged that might be relevant to the law consists largely of hypotheses far from certainties. Jed S. Rakoff, <u>Why the Innocent Plead Guilty</u> and <u>the Guilty Go Free and Other Paradoxes of Our Broken Legal System</u> 72 (2021); <u>see generally id.</u> Ch. 6 (offering examples of "dire results" that have followed the legal system's overly eager reliance on "brain science," including eugenics, lobotomies, and "recovered" memories). Still, "neuroscience is at a stage where it may be able to provide helpful insight into the behavior of youth in criminal matters.

<u>Immaturity</u>

Adolescent immaturity is the first hallmark of adolescence that should be considered in sentencing. A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions.

Neuroscience and psychology have given us a more refined explanation for this phenomenon, and one that bears on the sentencing of someone over 18 but not yet 25 years of age. The prevailing neuroscientific explanation for adolescents' immaturity begins with the fact that "[t]he frontal lobes, home to key components of the neural circuitry underlying 'executive functions' such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life."[1] Children's brains have a proliferation of neural connections. Then, beginning around age 11 to 12, rarely used connections are selectively pruned, making the brain more efficient. This increase in efficiency progresses from the back to the front of the brain; evidence suggests that, in the prefrontal cortex, the area responsible for executive functions, the process is not complete until the early 20s or later.[2] Given this understanding of the adolescent brain, scholars have begun to speak less of the outright "immaturity" of adolescents and more of a "maturity gap." They point out that the back-to-front process of neural pruning causes two overarching sets of cognitive "systems" to develop on different schedules.[3] Raul clearly had a difficult time in school, which impacted his ability to socialize healthily. The death of a close family member last year affected Raul deeply, according to his mother. Street life became more comforting for Raul.

Susceptibility

The Supreme Court mentioned a second "area of difference [between juveniles and adults] is that juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Roper, 543 U.S. at 569. Indeed, "[o]one of the hallmarks of adolescent risk-taking is that it is much more likely than that of adults to occur in the presence

---

[1] Sara B. Johnson et al., Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health

[2] Grace Icenogle et al., Adolescents' Cognitive Capacity Reaches Adult Levels Prior to Their Psychosocial Maturity: Evidence for a 'Maturity Gap' in a Multinational, Cross-Sectional Sample, 43 Law & Hum. Behav. 69 (2019) (NIH Public Access Version), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6551607/pdf/nihms-1025357.pdf.

[3] Policy, 45 J. Adolescent Health 216 (2009) (NIH Public Access Version), available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2892678/pdf/nihms207310.pdf, at 1.

of peers, as evidenced in studies of reckless driving, substance abuse, and crime. Recent studies in neuroscience and psychology provide a more refined and contextualized understanding of how and when this occurs. To begin with, a large body of research shows that this susceptibility is a transitory, age-linked phenomenon. The studies, however, do not include the effect of this digital and social media age, nor the impact of a culture of violence promoted as a viable framework through lifestyle and entertainment along racial lines. Despite the scholarly journey of academics showing that adolescents' immaturity reflects the "gap" between two cognitive systems developing on different schedules, research groups have posited that adolescents' relatively greater propensity toward risky behavior," especially in the presence of peers, reflects the joint contributions of two brain systems that affect decision-making: (i) an *incentive processing system*, which biases decision-making based on the valuation and prediction of potential rewards and punishments; and (ii) a *cognitive control* system, which supports goal-directed decision making by keeping impulses in check and by providing the mental machinery needed for deliberation regarding choices. This differential activation corresponded with a real-world difference in behaviors: adolescents (and only adolescents).

### Salvageability

The Supreme Court has noted that a "third broad difference [between juveniles and adults] is that the character of a juvenile is not as well formed as that of an adult. The personality traits of juveniles are more transitory, less fixed." Roper, 543 U.S. at 570. This "struggle to define their identity" decreases the likelihood "that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." Id. Respected social science studies support this conclusion. "[A]dolescents are overrepresented statistically in virtually every category of reckless behavior." Id. at 569 (internal quotation marks omitted). This includes crime. Based on "rigorous self-report studies," entirely "refrain[ing] from crime during adolescence" is statistically aberrant.[4] On the other hand, "the vast majority of adolescents who engage in criminal or delinquent behavior desist from crime as they

---

[4] Terrie Moffitt, Adolescent-Limited and Life-Course-Persistent Antisocial Behavior: A Developmental Taxonomy, 100 Psych. Rev. 674, 685-86 (1993).

mature."[5] Raul will be 21 years of age at sentencing and has been in federal custody awaiting the conclusion of this case. He is well aware that he will be sentenced to a considerable amount of time, which more than likely will ensure that he spends the majority of his twenties in federal prison. However, with the love of his family, he has the support to continue to reflect, grow, and mature. Being a young father provides even more reason to mature and develop a healthy character. To date, Raul has had no infractions while incarcerated at the MDC federal prison. Raul has used his time wisely while detained at MDC, diligently studying for his GED and attending academic courses offered at the facility.

<u>Dependence</u>

Finally, the Supreme Court has explained that adolescent offenders are less culpable because they have depended on others for most or all of their lives. Therefore, relative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment. <u>Roper,</u> 543 U.S. at 569. ("[J]uveniles have less control, or less experience with control, over their own environment. ' [A] s legal minors, [juveniles] lack the freedom that adults have to extricate themselves from a criminogenic setting.'") (quoting Steinberg & Scott, <u>supra</u> n.47, at 1014). The Supreme Court has recognized the importance of considering young people's dependence for decades. See <u>Eddings</u> v. <u>Oklahoma,</u> 455 U.S. 104, 115 (1982) (overturning mandatory death sentence for the juvenile offender because "when the defendant was 16 years old at the time of the offense, there can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and severe emotional disturbance is particularly relevant"). Raul is still developing and plans on moving back home with his mother when he is released.

---

[5] Laurence Steinberg & Elizabeth Scott, <u>Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty,</u> 58 Am. Psych. 1009, 1014 (2003).

### ***SENTENCING RECOMMENDATION***

Although the Sentencing Guidelines are no longer mandatory, the court must consider the Guidelines range and render a guideline analysis before making its ultimate sentencing determination.  *See, United States v. Booker, 534  U.S. 220, 245-246 (2005).*

In this case, the parties have agreed that the stipulated guideline range is 84 months. Ultimately, 18 U.S.C. §§ 3553 (a)  instructs the sentencing court to impose a sentence that is sufficient but not greater than necessary to punish the defendant and prevent the defendant from committing future crimes, *inter alia*.  The ultimate goal of the sentencing court is to find just punishment by carefully balancing important public policy considerations along with the prophylactic and rehabilitative objectives of 18 U.S.C. §§ 3553 (a). A sentence of 84 months of incarceration meets the goal of sentencing by Congress.

 

Respectfully,
*Kenneth J. Montgomery*
Attorney for Raul Ayala
396 Waverly Avenue
Brooklyn, New York 11238